CARBON STEEL CO. v. LEWELLYN, Internal Revenue Collector.

(District Court, W. D. Pennsylvania. January 14, 1919.)

No. 1957.

INTERNAL REVENUE ⬉9—"MUNITION MANUFACTURERS"—PERSON SUBJECT TO TAX.

A steel company, contracting to deliver howitzer shells to a foreign government, which manufactured bars from which shells are made and turned them over to subcontractors for completion, retaining ownership, paying subcontractors, and afterwards delivering shells under its contracts, is subject to tax imposed on "munition manufacturers" by Act Sept. 8, 1916, § 301 (Comp. St. § 6336⅛b), upon the "entire net profits actually received * * * from the sale" of the shells under contract.

At Law. Action by the Carbon Steel Company against C. G. Lewellyn, Collector of Internal Revenue for the Twenty-Third District of Pennsylvania. Judgment for defendant.

H. V. Blaxter, of Pittsburgh, Pa., for plaintiff.

B. B. McGinnis, Sp. Asst. U. S. Atty., of Pittsburgh, Pa., for defendant.

ORR, District Judge. In pursuance of a stipulation by the parties waiving a trial by jury, this case came on to be tried by the court without a jury.

Plaintiff claims a right to recover from the defendant the sum of $271,062.62, which the plaintiff charges was illegally assessed against it and illegally exacted from it as a munition manufacturer's tax for the period ending December 31, 1916. The plaintiff paid the amount of the tax under protest, and thereupon sought relief in the required manner from the Commissioner of Internal Revenue. Relief was refused by the Commissioner of Internal Revenue, and relief must be denied by this court.

Long before the passage of the act which first provided for the collection of a tax from the manufacturers of munitions, the plaintiff procured three several contracts from the British government for the delivery to the authorized representatives of said government at New York of 4½-inch howitzer shells. The first contract was dated January 26, 1915, the second September 29, 1915, the third October 7, 1915, and together the said contracts provided for the delivery of 548,-316 shells.

For the purposes of this case the said contracts may be considered to be similar in all respects. The contracts did not require that the steel company should manufacture the shells contracted for. They contemplated that some portion of the manufacturing might be done by the steel company and that other portions might be done by subcontractors. However, the steel company was bound to deliver the shells to said government when they were completed, and said government was bound to pay the steel company the price fixed in the contract.

---

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The work necessary to complete a shell in accordance with said contract is as follows:

(1) Obtaining suitable steel in bar form.

(2) Cutting or breaking said steel bars to proper length.

(3) Converting said cut bars or slugs into a hollow shell forging by means of a hydraulic press.

(4) The turning of said shell upon a lathe to exact dimensions.

(5) Closing in one end of said forging to form the nose of the shell.

(6) Drilling out the base of said shell and the inserting of a base plate.

(7) Threading of the nose of the shell, and the insertion of the nose bushing, and the insertion in said nose bushing of a wooden plug to protect the thread thereof.

(8) Cutting a groove around the circumference of said shell, and inserting therein a copper driving band, and turning said band to the required dimensions.

(9) Varnishing, greasing, and crating the completed shell.

The plaintiff's plant was not equipped and did not have facilities for doing any of said work, except the manufacture of steel suitable for said shells in bar form. The plaintiff manufactured suitable steel in its plant in bar form in what is known as mill lengths. That was the beginning of the actual work necessary to fulfill its contracts with the British government. The other steps in the manufacture of the completed shells were taken by others. The steel bars in mill lengths were sent to another corporation, which partially sawed, cut, or indented the same at points representing the required lengths of shell forgings, and thereafter redelivered the same to the plaintiff, which then separated them into short lengths, which are known in the trade as slugs.

The plaintiff then shipped the said cut bars or slugs to the Westinghouse Machine Company, another corporation, which converted the same, by forging, into hollow shell forgings and annealed the same, so that they would be suitable for machine work. Said hollow shell forgings were then subjected to the necessary lathe work by said Westinghouse Machine Company and by the Union Switch & Signal Company; each of said corporations treating approximately equal quantities. They also afterwards closed in one end of the forging to form the nose of the shell, and drilled out the base of the shell, and inserted a base plate, and, as well, also performed the work of threading the nose of the shell and inserting the nose bushing, and in said nose bushing inserting the wooden plug to protect the thread. They also afterwards performed the work of cutting the groove around the circumference of the shell, and inserted therein a copper driving band, and turned said band to the required dimensions. They also performed the work of varnishing, greasing, and crating the completed shell.

The said different steps were taken under contracts with the plaintiff, which furnished said subcontractors with the varnish, grease, and cement required, and which also furnished the wooden plugs to protect the threads in the nose of said shells (which the plaintiff procured under a contract with a corporation of the state of Maine), fixing screws (which plaintiff procured from a corporation of Illinois, under contract) and with copper tubing (which plaintiff procured from a cor-

poration of Pennsylvania, under contract), which copper tubing the Union Switch & Signal Company cut into rings, which rings were inserted by the company last named and the Westinghouse Machine Company in appropriate grooves cut in the shells and turned to the required dimensions.

The said Westinghouse Machine Company and said Union Switch & Signal Company crated the said shells for export and delivered the same to the plaintiff at said company's works for transportation to New York. The freight upon said shipments was paid by the plaintiff, who, in turn, delivered the shells to the British government in New York Harbor. While this work was being done by the said Westinghouse Machine Company and the Union Switch & Signal Company, the British government maintained inspectors at the plants of said companies, who examined the shells and approved those properly made in accordance with the specifications in the contracts between the British government and the plaintiff.

None of the corporations who performed any of the work or furnished any of the materials entering into the completed shells after the plaintiff had manufactured the steel in bar form were in any manner connected with, or controlled by, the plaintiff, its officers, directors, or stockholders, nor in any way could one of them be properly called a subsidiary of the plaintiff.

For the purpose of keeping separate the profit upon said shell contracts, plaintiff opened a separate set of books, upon which it credited to an account known as "Special Contract Account" the advance payments received from the British government on account of said work, and from said account made all payments to subcontractors, and other payments for expenses connected with said work, and credited to said account all money received from the British government, and, when said contracts were completed, transferred to its general books the remaining net profit in said account.

As a result of this, the said net profit did not show, in any way, upon the general books of plaintiff until the profit was thus finally determined. The plaintiff charged to said special contract account the steel bars in mill lengths manufactured by it at market prices, in the same manner as if plaintiff had purchased said steel bars in mill lengths in the open market, for the reason that such work was not part of plaintiff's business. This entry of the market prices was for the purpose of determining the net profit upon the shell contracts. Subsequently, when making its return under protest, under the law providing for munition manufacturers' tax, the plaintiff, at the request of the Department of Internal Revenue, altered the charge for steel bars in mill lengths, so as to reflect the same in its return at cost price, instead of market price, therefore adding to the amount upon which plaintiff was taxed the profits shown on plaintiff's general books upon said steel bars in mill lengths.

The tax upon the increased profit caused by charging steel bars at
cost instead of market prices amounted to.....................$ 15,112.39
The tax upon the balance of profit............................. 255,950.23

The total tax paid is...............................$271,062.62

This was paid to the defendant on December 29, 1917.

The plaintiff employed none of its capital in the manufacture of munitions, but it employed the advance payments made by the English government. It contracted no interest-bearing debts or loans to meet the needs of such manufacture.

The gross payments from the British government constitute the gross amount of income received by it, being a total of........$8,544,337.51

As against that sum the plaintiff charged the cost
of raw materials........................$1,316,626.28
The running expenses........................  717,457.21
It paid to the other corporations for work done
and materials furnished........................ 4,341,753.06
There were no other items to be deducted as allowed by section 302 of the act of Congress, because the plaintiff paid no interest or taxes, and sustained no loss or depreciation, or made any apportionment or allowance for amortization, etc.
The sum of the deductions....................................  6,375,836.55

The total net profits upon which the tax was computed,
therefore, were....................................  $2,168,500.96

In addition to the foregoing facts, it appears that the Westinghouse Machine Company and the Union Switch & Signal Company, and perhaps others who did work or furnished material under the contracts aforesaid, were assessed for a munition manufacturer's tax upon the profits made by them under their contracts aforesaid with the plaintiff and severally paid the amounts of the respective assessments.

Plaintiff's methods of keeping its accounts, or of performing its obligations under the contracts with the British government, are not to be deemed as evidence of any intent to evade its liability for the tax, because such methods were adopted and such course of business was begun prior to the passage of the act of Congress.

The act under which the assessments was made was passed September 8, 1916, and is entitled "An act to increase the revenue, and for other purposes." Act Sept. 8, 1916, c. 463, 39 Stat. 756–780 (Comp. St. §§ 6336a–6336¼a). The particular parts of that act which determine plaintiff's liability upon the facts found are set forth under title III, "Munition Manufacturers' Tax," and are as follows:

"Sec. 301. That every person manufacturing * * * (c) projectiles, shells, or torpedoes of any kind, * * * shall pay for each taxable year, in addition to the income tax, * * * an excise tax of 12½ per cent. upon the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States: Provided, however, that no person shall pay such tax upon net profits received during the year 1916 derived from the sale and delivery of the articles enumerated in this section under contracts executed and fully performed by such person prior to January 1, 1916."

Section 302 specifies the deductions to be allowed severally "from the gross amount received or accrued for the taxable year from the sale or disposition of such articles manufactured within the United States."

"Sec. 307. The tax may be assessed on any person for the time being owning or carrying on the business, or on any person acting as agent for that person in carrying on the business, or where a business has ceased, on the person who owned or carried on the business, or acted as agent in carrying on the business immediately before the time at which the business ceased."

Comp. St. §§ 6336¼b, 6336¼c, 6336¼h.

If the excise tax provided for in the foregoing sections be a tax imposed upon manufacturers of munitions, can it be said that the plaintiff escaped liability under the facts found in this case? The plaintiff, by its engagement with the British government, undertook to manufacture, or have others manufacture, the shells. It began the manufacture of the shells to the extent of making the round bars in mill lengths. The steel in said round bars was the plaintiff's property, and remained the plaintiff's property during all succeeding processes, and until the plaintiff delivered the finished product to the British government. If this court would hold that the plaintiff ceased to be a manufacturer when it had finished the manufacture of the round bars in mill lengths out of which the shells were made, although it retained title thereto during the processes performed by others, the construction of the law would be too illiberal, and would tend to defeat what plainly appears to be the purposes of Congress. The tax, however, is not upon the manufacturer; it is upon the entire net profits actually received or accrued from the sale or disposition of such articles.

The liability for the tax is not expressly limited to the person manufacturing the munitions. It may be assessed on any person for the time being owning or carrying on a business, or on any person acting as agent for such a one. In the present case, the business was carried on by the Carbon Steel Company. In fact, the entire business of furnishing the shells to the British government, in pursuance of the several contracts, was carried on by the plaintiff. The making of the round bars was continuing long after the first slugs were delivered to the other corporations. The clerk (or clerks) of the plaintiff was stationed at the works of the Westinghouse Machine Company and the Union Switch & Signal Company for the purpose of checking up the work as it progressed. The case is not made any different because those companies paid the assessment upon their profits for making parts of the shells. The plaintiff was not charged in the assessment against it with any of the profits made by its subcontractors. The tax paid by it was a tax assessed upon its profits only. In every aspect of the case, the plaintiff appears to have been liable to the payment of the tax.

Therefore the plaintiff is not entitled to recover, and judgment will be entered in favor of the defendant.